FILED

2012 Jul-06  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **CARMEN DORENE RODRIGUEZ,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:11-CV-01087-RDP** |
| | } | |
| **MICHAEL J. ASTRUE,** | } | |
| **COMMISSIONER OF SOCIAL** | } | |
| **SECURITY,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff Carmen Dorene Rodriguez ("Plaintiff") brings this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her applications for a period of disability, Disability Income Benefits ("DIB") under Title II, and Supplemental Security Income ("SSI") benefits under Title XVI. *See* 42 U.S.C. §§ 405(g), 1383(c). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be remanded.

## I.    Proceedings Below

Plaintiff filed applications for a period of disability, DIB, and SSI on December 16, 2003 alleging a disability onset date of September 20, 2002. (R. 11, 160). The applications were denied March 18, 2004 (R. 13) and upon reconsideration January 6, 2005. (R. 11). Plaintiff re-filed her applications on July 11, 2005, alleging the same onset of disability date, September 20, 2002. (R. 7). On September 20, 2005, Plaintiff's applications were denied and again upon reconsideration on April 21, 2006 (R. 7, 9). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") (R. 79-80), and a hearing was held before ALJ Helen O. Evans on October 16, 2008 in

Statesville, North Carolina. (R. 664-700). Plaintiff was represented by an attorney and submitted medical records covering the period from 1999 to 2008. (R. 253-587). The Disability Determination Service ("DDS") also requested medical, psychiatric, and physical and mental residual functional capacity ("RFC") evaluations of Plaintiff. (R. 360-75, 389-437, 464-68, 529-77). The ALJ found Plaintiff suffers from the severe impairments of: degenerative disc disease of the lumbar spine, lumbar radiculopathy, status post L4/5 fusion; degenerative joint disease in the knees hands and back; major depressive disorder, recurrent, moderate; rule out borderline intellectual functioning; and history of alcohol and substance abuse, currently in remission. (R. 33). On January 26, 2009, the ALJ determined that Plaintiff was not eligible for a period of disability, DIB, or SSI because she was not under a disability within the meaning of §§ 216(i), 223(d), or 1614(a)(3)(A) of the Act. (R. 43). Plaintiff submitted medical records from Dr. Maxy for the first time to the Appeals Council (R. 6, 590-91), but the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (R. 15).

## II.    Plaintiff's Medical and Consultative History

Plaintiff was treated by Dr. Steven Gold from September 2002 to March 2004, the period before and just after Plaintiff had surgery to fuse L4/5 discs in her back. (R. 290-313). Plaintiff's first visit occurred September 9, 2002. (R. 313). Plaintiff stated she had low back pain after doing heavy lifting at work. (R. 313). Dr. Gold's examination revealed Plaintiff had "extreme difficulty moving about due to back pain." (R. 313). Plaintiff was given an injection and prescriptions for Flexeril and Lortab 10. (R. 313). At subsequent visits, Plaintiff presented with "very severe, low back pain" and was diagnosed with "episodic lumbago SP discotomy" flaring with excess activity. (R. 305, 310). Plaintiff was given injections and prescriptions for Lortab and Flexeril. (R. 307, 310).

2

On November 17, 2003, Plaintiff was again seen by Dr. Gold, presenting with severe pain in her left lower back, radiating down her leg to the knee. (R. 304). Dr. Gold assessed Plaintiff with acute lumbar pain SP discotomy and stated that she needed "urgent pain control and investigation." (R. 304). Dr. Gold provided Plaintiff with IM injections and referred her to the Catawba Valley Medical Center Emergency Department ("ER") for further evaluation. (R. 304). Plaintiff presented to the ER that same day where she was examined by Dr. Steven Williamson. (R. 269). She was sent for x-rays of her spine, and ended up leaving after the x-rays were taken without signing out or hearing Dr. Williamson's suggested course of treatment. (R. 269, 271). Dr. Williamson's diagnosis was "[l]umbar low back pain, lumbar radiculopathy." (R. 269-70).

On November 20, 2003, on referral from Dr. Gold, Plaintiff underwent an MRI of the lumbar spine. (R. 267). The next day, Dr. Gold recorded Plaintiff's pain score as "10!!!" and, reviewing her MRI results, stated that she had a L4-5 disc herniation. (R. 267, 301). Dr. Gold referred Plaintiff to Dr. Alfred Geissele at Carolina Orthopedic Specialists and prescribed her Methadone. (R. 301).

On November 24, 2003, Plaintiff went to the ER, and the physician determined that she had had a "Methadone overdose or increased sensitivity." (R. 259-65). Plaintiff was hospitalized to allow Methadone withdrawal and possible addition of prednisone for pain relief. (R. 266).

Plaintiff presented to Dr. Gold again on December 15, 2003 in severe pain, despite her current pain medication. (R. 299). Dr. Gold assessed her condition as, relying on her prior MRI, a "L5 nerve root impingement" and provided Plaintiff with a prescription for Percocet. (R. 299).

On December 17, 2003, Plaintiff again saw Dr. Alfred Geissele on Dr. Gold's referral. (R. 289). The examination revealed "markedly antalgic gait" where Plaintiff walked "leaning over at the waist both in the forward direction as well as toward her left side." (R. 289). Dr. Geissele's

3

diagnosis of Plaintiff's condition was recurrent lumbar disc herniation; lumbar radiculitis secondary to diagnosis of recurrent lumbar disc herniation; and moderate degeneration of L4/5. (R. 289).

On January 2, 2004, Plaintiff went back to Dr. Gold for her back pain. (R. 293). Dr. Gold noted that Plaintiff was using the Fentanyl patch, placing half on her hip, half on her ankle, resulting in a reduction in pain from 10 to 4. (R. 293). He continued her prescriptions of Clonazepam, the Fentanyl patch, and Percocet. (R. 293).

On February 5, 2004, Plaintiff was seen by Michael Blau, a physician's assistant in Dr. Geissele's practice. (R. 287). He noted that Plaintiff continued to have low back pain and that her primary care physician had increased her narcotics significantly. (R. 287). It was recorded that Plaintiff had consented to go ahead with disc fusion surgery. (R. 287). Three days later, Plaintiff was admitted to Frye Regional Medical Center in North Carolina for disc fusion surgery. (R. 284). She was first examined by Blau, with Dr. Geissele as the Attending Physician of record, and her admission diagnosis was "Lumbar degenerative disc disease with L4-5 herniated nucleus pulposus." (R. 284). Treatment notes indicate that Plaintiff had been "utilizing long term narcotics for pain control and . . . wishes to go ahead with lumbar decompression and fusion." (R. 284). There is also a notation that "Patient states that methadone makes her sick, but she is not allergic to it." (R. 284). Physical examination revealed "[p]ositive left antalgic gait. Positive left straight leg raise. Increased light touch on the left lateral calf and dorsum of the left foot." (R. 285). Blau informed Plaintiff "that pain control may be a significant problem postoperatively due to the high strength narcotics she has taken in the preoperative setting . . . [and] encouraged her to wean off the narcotics as much as she can prior to surgery." (R. 285). Dr. Geissele performed the disc fusion surgery on February 9, 2004.

On February 19, 2004, Plaintiff went to Dr. Geissele for a follow-up. (R. 280). He stated that Plaintiff's wound was "well healed." (R. 280). Dr. Geissele noted that he would increase Plaintiff's

4

dosage of Percocet, but that he had "discussed the fact that [Plaintiff] will need to work actively to try to downgrade her narcotic use as time goes on." (R. 280). Further, when Plaintiff's current prescription for Percocet ran out, he would reduce the dosage or replace it with Lortab 10. (R. 280).

On March 12, 2004, Plaintiff returned to Blau. (R. 440). Plaintiff reported that she continued to experience pain, which was aggravated by a recent fall. (R. 440). After a physical examination and imaging studies, Blau noted that Plaintiff's incision was "nicely healed" and there were no signs of disruption of the fusion. (R. 440). Blau provided Plaintiff with a prescription for Percocet, but refused to give her sleep and anxiety medications because she had to seek treatment for those conditions from her primary care physician. (R. 440). Blau was concerned with Plaintiff's use of prescription medications and overmedication. (R. 440). The file also contains a later, hand-written notation where Plaintiff reported that her prescribed Percocet was stolen. (R. 440).

On that same day, Plaintiff saw Dr. Gold for her pain and difficulty sleeping since the surgery and the fall. (R. 291). Dr. Gold noted that Plaintiff was experiencing stress due to family problems and that she was already on Percocet for her back pain. (R. 291). He continued her Lexapro and Clonazepam prescriptions and also recommended drug and alcohol treatment. (R. 291).

A week later, Plaintiff returned to Dr. Gold with complaints of worsening low back pain. (R. 290). Dr. Gold noted Plaintiff's pain score was 4 and provided her with a prescription for Percocet and the Fentanyl patch. (R. 290). The pharmacy informed Dr. Gold that someone had picked up Plaintiff's Percocet on March 12, 2004, but Plaintiff and her husband claimed that neither of them had picked it up.  (R. 290). They also stated that painkillers had been stolen from their house, perhaps by a friend of their son. (R. 290). Dr. Gold informed Plaintiff he would only prescribe medication pending the availability of Dr. Geissele to see Plaintiff on April 1, 2004. (R. 290). When Plaintiff and her husband returned to the pharmacy, the pharmacist contacted Dr. Gold by telephone

and informed him that the signature by Plaintiff's husband matched the signature from March 12, 2004. (R. 290). Thus, Dr. Gold authorized only the Fentanyl patch. (R. 290).

Plaintiff was rushed to Frye Regional Medical Center on March 21, 2004 for a possible accidental overdose from the Fentanyl patch. (R. 328). Plaintiff apparently had run out of pain medicine and began to cut the Fentanyl patches in half, using one-half at a time. (R. 328). Plaintiff's back pain was rated 9-10. (R. 329, 330).  Plaintiff was ultimately diagnosed with "Acute Accidental Overdose of Fentanyl." (R. 328). She was released and advised to follow-up with a general physician or orthopedist the next day for safe pain control, as well as instructed to not take any additional pain medication that night. (R. 328). She was prescribed Lortab and Vicodin. (R. 328).

On April 1, 2004, Plaintiff was seen by Blau on behalf of Dr. Geissele. (R. 439). Although most of this record is illegible, there is a notation that Plaintiff's pain medications would not be refilled due to her failure to file a police report regarding the theft of Percocet in March. (R. 439). Blau noted that Plaintiff's physical condition remained unchanged and that he and Dr. Geissele would try to determine the best way to manage her pain. (R. 439). Plaintiff was instructed to return in six to eight weeks. (R. 439). On June 24, 2004, Plaintiff returned, and the "Patient Work Status Report" from this visit indicated that she could return to working "full duty" on June 28, 2004, with no restrictions noted. (R. 438). There are no further treatment notes from this visit. (R. 438).

On August 14, 2004, Plaintiff went to the Lincoln Medical Center Emergency Department for moderate low back pain. (R. 356-58). Plaintiff was given injections and prescriptions for pain medication and was directed to rest and refrain from heavy lifting. (R. 355, 358).

On November 26, 2004, Plaintiff was seen by Dr. John Kessel's office primarily for back pain. (R. 378). Plaintiff claimed she was not taking any medications. (R. 378). The examination revealed that she had "decreased range of motion with pain" and "[s]ignificant inflammation and

6

pain and spasm." (R. 378). She was diagnosed with chronic low-back pain and acute Sciatica and prescribed Vicodin, Flexeril, and Celebrex. (R. 378). On December 10, 2004, Plaintiff returned to Dr. Kessel's office for a follow-up visit. (R. 377). She was still experiencing pain, and her diagnosis remained the same and her condition the same as (or slightly worse) than her condition from her last visit. (R. 377). She was directed to continue her previously prescribed medication. (R. 377).

On January 24, 2005, Plaintiff returned again to Dr. Kessel's office for a refill of her medications. (R. 453). Plaintiff complained that her chronic back pain was preventing her from working and stated that she had filed for disability for the second time. (R. 453). She was observed to be in moderate, not acute, pain, causing decreased range of motion. (R. 453). Plaintiff returned on February 4, 2005, complaining that she "cannot do anything, cannot do her regular housework, cannot move a vacuum, cannot sit for long periods of time without pain running down her leg." (R. 452). The examination revealed "very decreased range of motion and difficulty walking" and pain with flexion and rotation, and upon palpation of the sciatic area. (R. 452). On February 23, 2005, during another visit, Plaintiff was "slumped over a four-pronged cane in tears with very little range of motion and very slow gait as a result of the [pain]." (R. 452). She was referred to physical therapy three times per week for four weeks and prescribed Neurontin. (R. 452). Although Plaintiff went to a physical therapy session at Frye Regional Medical Center a few days later, she never returned, informing the physical therapist that she was moving out of state. (R. 441-43). On March 17, 2005, Plaintiff once again returned to Dr. Kessel's office, where an examination revealed the range of motion in her lower back was significantly limited and that she was in "a lot of pain with palpation of the lower back." (R. 451). Because her lower back pain had not improved, her dosage of Neurontin was increased. (R. 451).

Plaintiff was examined by Dr. Michael Haahs on June 7, 2005, complaining of joint pain and chronic back pain. (R. 492). Dr. Haas referred Plaintiff to Lake Norman Regional Medical Center for x-rays of hands, wrists, and knees. (R. 471-72, 493). The x-rays of Plaintiff's hands and wrists did not reveal any problems and the x-ray of her knees showed "slight thinning, medial compartment" but otherwise normal knees. (R. 471, 472). Over the next seven months, Dr. Haas frequently saw Plaintiff for similar complaints and renewed her prescriptions. (R. 474-91).

On August 9, 2005, Plaintiff visited Dr. Haahs for pain in her left shoulder, but an MRI revealed no significant problems. (R. 470, 488). On November 25, 2005, Dr. Haahs referred Plaintiff for an MRI of the lumbosacral spine. (R. 469). The MRI results were "left L4 nerve root is difficult to visualize . . . due to metallic artifact. There is suggestion of swelling of this root. If clinically significant, a left L4 radiculopathy might be produced. A radiculitis could have this appearance." (R. 469). On December 16, 2005, when Plaintiff returned for medication refills, Dr. Haas noted that her "pain is out of proportion to MRI finding." (R. 475). His proposed course of action was a referral to a specialist or a pain clinic. (R. 474-75). On July 6 and December 16, 2005, Dr. Haahs prescribed Plaintiff the Fentanyl patch, and on December 16, 2005, Percocet. (R. 475, 491).

From July 6, 2006 to July 29, 2008, Plaintiff was treated by Dr. Neil Reece. (R. 500-18, 584-87). At her July 6, 2006 visit, Plaintiff complained of back pain and arthritis, and reported pain of 10/10 without medications and 3-4/10 with medication. (R. 517). She appeared healthy and in no distress. (R. 517). Upon examination, Dr. Reece noted "bilateral lower paraspinal muscle tenderness" and also noted a "mildly depressed affect." (R. 517). He continued Plaintiff's prescription for the Fentanyl patch. (R. 518). Dr. Reece increased Plaintiff's dose of the Fentanyl patch on October 5, 2006 because her pain was worsening with weather changes, and also prescribed her Lyrica and Flexeril for low back pain. (R. 513, 514). On her next visit, November 2, 2006,

8

Plaintiff reported better pain control with the increased medications, though she was using a cane and had a cautious, painful gait. (R. 511). Endocet was added to her pain prescriptions. (R. 512).

When Plaintiff returned on December 1, 2006, Dr. Reece noted that Plaintiff continued to have good pain control on the new drug regimen, but still had a cautious painful gait and used a cane. (R. 509-10). Upon physical examination, Dr. Reece observed "bilateral lower paraspinal muscle tenderness, moderately reduced extension, severely reduced flexion, severely reduced lateral motion bilaterally, severely reduced rotation bilaterally." (R. 510). Similar observations were made at a return visit on February 2, 2007. (R. 507). On April 4, 2007, Dr. Reece noted "pain control good today 2/10." (R. 505). On August 31, 2007, Plaintiff returned for a follow-up visit to refill her prescriptions. (R. 503). Plaintiff informed Dr. Reece that she was applying for total disability, and he noted that he supported her and "would help in any way possible." (R. 503).

On November 13, 2007, in response to a request from the SSA Office of Hearings and Appeals, Dr. Reece completed a medical assessment. (R. 496-99). Based on Plaintiff's history and "clinical appearance on examination," Plaintiff was diagnosed with Degenerative Disc Disease; Depression; and Fibromyalgia. (R. 496). Her current medications were listed as: Effexor XR, Fentanyl patch; Flexeril; and Lyrica. (R. 496). According to Dr. Reece's assessment, Plaintiff's conditions greatly limited her physical ability, and she could not lift any weight even occasionally. (R. 497). Further, he stated that Plaintiff could sit or stand/walk less than two hours per day, and that she could not get through an eight-hour workday without lying down. (R. 497). Plaintiff could never climb, stoop, crouch, kneel, crawl, reach, or pull/push, and could only occasionally balance. (R. 497). Dr. Reece concluded that Plaintiff did not retain the ability to engage in sustained gainful employment (R. 498), and he deemed Plaintiff's version of her health problems "to be reliable and consistent with the nature and severity of the clinical condition I observe." (R. 499).

9

Plaintiff's condition, as examined by Dr. Reece, remained essentially the same from November 26, 2007 to July 29, 2008. (R. 500, 586). On November 26, 2007 and July 29, 2008, Dr. Reece noted that Plaintiff was taking breakthrough medications several times daily and reported her pain as 3-4/10. (R. 500, 586). Additionally on these dates, similar to her conditions on December 1, 2006 and February 2, 2007, Plaintiff was observed to have "bilateral lower paraspinal muscle tenderness, moderately reduced extension, severely reduced flexion, severely reduced lateral motion bilaterally, severely reduced rotation bilaterally." (R. 501, 586). On May 30 and July 29, 2008, Dr. Reece noted that Plaintiff's pain control was stable, and on July 29, 2008, stated that there was no sign of misuse of her medications. (R. 584, 586).

On October 3, 2008, after a referral from Dr. Reece, Plaintiff was seen by Dr. Ralph Maxy at Carolina Orthopaedic Specialists for her continuing back pain. (R. 591). She complained that she could not stand or sit long, or perform activities of daily living. (R. 591). Dr. Maxy observed that Plaintiff walked with slow steps and "grimace[d] throughout the entire exam as if in significant low back pain with radiation to the right buttock." (R. 591). In addition to reduced flexion, he noted tenderness upon palpation "diffusely worse over the super gluteal area on the right side." (R. 591). Dr. Maxy referred Plaintiff for an IR myelography and CT of the lumbar spine, which were performed on October 9, 2008. (R. 581-82). The IR myelography revealed "no large defect." (R. 582). The CT scan of Plaintiff's lumbar spine indicated a mild disc bulge at L3-4, with "focal far right lateral disc protrusion abutting and displacing the right L3 nerve root in a far right lateral direction." (R. 581). The CT scan also revealed "moderate degenerative facet change" at the L3-4 and L5-S1 levels. (R. 581). Plaintiff returned to Dr. Maxy on October 14, 2008 to discuss the test results, and her condition was assessed as: lower back pain with right lower extremity radiculopathy;

10

status post previous lumbar fusion at L4-5; and herniated nucleus pulposus right L3-4. (R. 590). Dr. Maxy suggested she either proceed with epidural injections or undergo surgery.[1] (R. 590).

Plaintiff underwent several consultative examinations following her applications for disability benefits. On November 20, 2004, a consultative medical exam was performed on behalf of DDS in North Carolina, by Dr. Douglas Chen. (R. 360). Plaintiff complained of "numbness and paresthesias of the right leg on a frequent basis." (R. 360). Plaintiff reported that she was able to shower, dress herself, raise things above her head, and perform other physical manipulations with her hands. (R. 360). She stated she did not drive, do any chores or yard work, and could walk for only 15 minutes at a time. (R. 360). Plaintiff denied having any hobbies and was noted to be a poor historian. (R. 360). Dr. Chen diagnosed her with "failed back syndrome." (R. 363). He stated that Plaintiff's two previous surgeries (one in 1996 and the other in 2004) have not helped her condition and that her "prognosis is poor." (R. 363). Although Plaintiff had received optimal medical care, Dr. Chen opined that her condition would not improve. (R. 363). He recommended Plaintiff have a sedentary range of work and further indicated that she could lift or carry no more than ten pounds on an occasional and frequent basis. (R. 363). Dr. Chen concluded that Plaintiff could "stand or walk 2-4 hours in a normal workday with breaks every two hours . . . [and] sit continuously for up to six hours with breaks every two hours." (R. 364). He noted her postural limitations as "climbing, stooping, kneeling, pushing, pulling, crawling, crouching, and balancing." (R. 364).

On December 9, 2004, a consultative psychological exam was performed on behalf of the DDS by Elizabeth Lane, M.A. in North Carolina. (R. 367). According to the report, Plaintiff was

---

[1] Dr. Maxy's notes from the October 3 and 14, 2008 examinations of Plaintiff were not submitted to the ALJ; they were first provided to the Appeals Council. (R. 6). The results from the tests performed on Plaintiff – the IR myelography and CT of the lumbar spine – were provided to the ALJ.

not currently taking any medications. (R. 367). Lane identified Plaintiff as "somewhat of a poor historian due to demonstrated problems with cognition that were moderate in nature." (R. 367). Plaintiff was suffering from severe back pain, and Lane did not believe that Plaintiff was malingering or exaggerating her physical pain. (R. 371-72).

As to her mental state, Lane opined that Plaintiff's irritability and asociality stemmed from her physical pain and depression. (R. 372). In summarizing her findings, Ms. Lane stated:

> Plaintiff appears to be functioning below the Average range of intelligence with moderately impaired cognitive abilities as a result of her physical condition and moderate to severe levels of depression. . . . she demonstrated difficulty with keeping her train of thought and with staying focused. Additionally, she demonstrated difficulty with recalling important recent and remote information. She exhibited delay in processing information.

(R. 373). Lane concluded that cognitively, Plaintiff might experience "moderate difficulty . . . satisfactorily perform[ing] a repetitive day-to-day work routine and complet[ing] work related tasks. (R. 374). Socially, and emotionally, Lane concluded Plaintiff "might experience moderate to severe difficulty . . . being able to satisfactorily adjust to a work environment and schedule, tolerate work stressors and demand, and relate well with coworkers and/or supervisors." (R. 374). Lane's assessment of Plaintiff was approved by Alec Riddle, Ph.D. (R. 374).

On September 8, 2005, Plaintiff was referred by the DDS for a comprehensive clinical psychological evaluation, which was made by Michelle Coates, M.A. on behalf of Christine Cooper, Ph.D. (R. 464, 468). Plaintiff claimed she was unable to climb the stairs and was interviewed in her car at her request. (R. 464). Although Coates observed generally that Plaintiff was cooperative with the interview, she was uncooperative with the Cognitive Responses section of the evaluation. (R. 464, 465). Coates noted that the information provided by Plaintiff was of "questionable reliability in that the claimant was unsure of a lot of her answers," and that Plaintiff was not specific in

describing her physical limitations. (R. 465). Additionally, Coates stated that Plaintiff appeared to be experiencing moderate depression, with a history of recurrent major depressive episodes, and possible worsening of depression with experienced pain. (R. 468). Coates concluded that Plaintiff was functioning in the borderline range of intelligence with poor insight. (R. 468). Due to Plaintiff's uncooperativeness, Coates did not determine how she would function intellectually and cognitively in a work setting. (R. 468). Moreover, noting Plaintiff seemed "overmedicated," Coates did not draw any conclusions about how she would function socially and emotionally in a work setting. (R. 468).

The DDS also reviewed the available medical evidence to complete non-examining mental and physical RFC assessments of Plaintiff. A non-examining mental assessment was prepared March 12, 2004 by Dr. Marianne Breslin, Psychiatric Consultant. (R. 389, 398-411). Dr. Breslin stated that Plaintiff was currently on medications for anxiety, that the medications were effective at controlling anxiety, and thus recommended "non-severe mental impairment." (R. 389). A second non-examining mental RFC was performed on January 4, 2005 by W. W. Albertson, Ed.D. (R. 420-37). Dr. Albertson concluded that, despite some social imitations, Plaintiff would be able to perform simple, routine tasks in a low stress setting, but only for two hours at a time. (R. 436).

A non-examining physical RFC assessment was performed March 8, 2004 by Katrina McKoy, SDM. (R. 390-97). Based upon Plaintiff's history of back problems, lumbar surgeries, and the notation that Plaintiff appeared to be doing well on February 19, 2004, McKoy recommended "E3 to Light with occasional stooping." (R. 397). McKoy further noted that Plaintiff should only occasionally lift and/or carry a maximum of 20 pounds; frequently lift and/or carry a maximum of 10 pounds; stand and/or walk about 6 hours per 8-hour workday; and sit for about 6 hours per 8-hour workday; with unlimited push/pull. (R. 391). Further, McKoy concluded Plaintiff could frequently climb ramps, stairs or ladders; balance; kneel; crouch; or crawl; and occasionally stoop. (R. 392).

13

A second non-examining physical RFC assessment was performed by Dr. William Robie on January 3, 2005 (R. 412-19), and a third by Dr. David Fitzmorris on August 31, 2005. (R. 529-36). Drs. Robie and Fitzmorris proposed the same exertional limitations for Plaintiff as McKoy had. (R. 413, 530). Dr. Robie further concluded that Plaintiff could frequently balance, kneel, or crawl; and occasionally stoop, crouch, or climb ramps, ladders or stairs. (R. 414). Dr. Fitzmorris's conclusions on Plaintiff's postural limitations were the same as Dr. Robie's, except Dr. Fitzmorris did not opine on her ability to kneel. (R. 531). Drs. Robie and Fitzmorris both acknowledged that their findings (that Plaintiff's activities of daily living and physical findings were comparable to a light RFC) differed from the findings of Dr. Chen, an examining source, which indicated that Plaintiff could perform "sedentary work."  (R. 363-64, 418, 535).

## III.    The ALJ Decision

To establish that a claimant is entitled to a period of disability and disability insurance benefits, the claimant first bears the burden of proving that her disability began during the time that she was insured by Social Security. 20 C.F.R. § 404.131. Thereafter, disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1 *et. seq*. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Absent such impairment, the claimant may not claim disability. Third, the ALJ must determine whether the claimant's

impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). If such criteria are met, the claimant is declared disabled.

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's RFC, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. If the claimant is determined to be capable of performing past relevant work, then she is deemed not disabled. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.

In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to show the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(g), 404.1560(c). In making this determination, the Commissioner will use the Medical-Vocational Guidelines ("MVGs") in Appendix 2 of Part 404 of the Regulations. The MVGs will direct findings of "disabled" or "not disabled" when all of the claimant's vocational factors and RFC match a category listed in the Appendix. When the claimant's vocational factors and RFC do not match a listed category (the claimant is unable to perform the full range of work for her RFC), the ALJ will consider the testimony of a vocational expert ("VE").

In this case, the ALJ determined that Plaintiff: (1) met the insured status requirements of the Act through December 31, 2008 (R. 33); (2) did not engage in substantial gainful activity since the

claimed onset date of her disability, September 20, 2002 (R. 33); (3) had the severe impairments of degenerative disc disease of the lumbar spine, lumbar radiculopathy, status post L4/5 fusion; degenerative joint disease in the knees, hands and back; major depressive disorder, recurrent, moderate; rule out borderline intellectual functioning; and history of alcohol and substance abuse, currently in remission (R. 33); but (4) had no impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 37). The ALJ stated the following about Plaintiff's RFC:

> [Plaintiff] retains the residual functional capacity to perform light work . . . except she requires the option to alternate sitting and standing in 3/4 to one hour increments. She is limited to occasional climbing of ramps and stairs and no climbing of ladders, ropes or scaffolds. She can occasionally stoop/bend, and crouch/squat. She can perform frequent reaching, but not constant. She should avoid exposure to extreme cold, wetness, vibration, and ordinary workplace hazards (machinery, heights, electric shock, driving automotive equipment). She is unable to work at jobs requiring complex decision making, constant change, or dealing with crisis situation (stress). She is limited to simple, routine, repetitive tasks, not performed in a production or quota based environment, and involving only simple, work-related decisions. She is limited to frequent face-to-face contact with the general public. She is limited to low-stress jobs without numerical production goals; that is, unable to work at a production rate (*i.e.*, quota base, piecemeal rate or on a conveyor belt).

(R. 38). The ALJ found that this RFC prevented Plaintiff from performing her past relevant work. (R. 42). The ALJ then relied on the testimony of the VE to conclude that there were a significant number of jobs in the national economy that Plaintiff could perform including folding machine operator, sealing and canceling machine operator, and ticket marker. (R. 42-43).

## IV.   Plaintiff's Argument for Reversal

Plaintiff alleges the following three errors by the ALJ warranting reversal: 1) an improper application of 20 C.F.R. § 404.1527(d)(2) by failing to give controlling weight to an examining physician; 2) an improper hypothetical to the VE; and 3) a failure to properly apply 42 U.S.C. § 423(d)(5)(A) with respect to Plaintiff's subjective complaints of pain.

**V. Standard of Review**

Judicial review of disability claims under the Act is limited to whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701. Legal standards are reviewed *de novo*. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

**VI.     Discussion**

    **A.     The ALJ Did Not Demonstrate Good Cause to Disregard the Opinion of Dr. Reece and the Hypothetical Posed to the VE Was Improper.**

Absent a showing of good cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the ALJ. *Lamb*, 847 F.2d at 703. "[The Eleventh Circuit] has concluded 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). "If the opinion of a treating physician is disregarded, the ALJ must clearly articulate its reasons." *Phillips*, 357 F.3d at 1241. The ALJ's reasons for discounting the opinion of treating physicians must be supported by substantial evidence. *Lamb*, 847 F.2d at 703. Where medical evidence does not conclusively counter the treating physician's opinion and no other good cause is presented, the Commissioner cannot discount the treating doctor's opinion. *Shnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987). "The reports of reviewing nonexamining physicians do not constitute substantial evidence on which to base an administrative decision." *Lamb*, 847 F.2d at 703.

Plaintiff argues that the ALJ erred in not giving controlling weight to Dr. Reece's November 13, 2007 opinion.  On November 13, 2007, Dr. Reece, Plaintiff's treating physician, completed an assessment form for Plaintiff's SSI/disability determination and concluded that Plaintiff did not retain the ability to engage in sustained gainful employment, indicating that she was disabled. (R. 496-99). The ALJ stated that she did not give controlling weight to Dr. Reece's November 13, 2007 assessment because this assessment is "inconsistent with [Dr. Reece's] treating notes and medical evidence of record." (R. 41). First, however, the ALJ's summary of Dr. Reece's treating notes does

not reveal any inconsistencies between Dr. Reece's November 13, 2007 assessment of Plaintiff and various other examinations of Plaintiff by Dr. Reece.  In fact, the ALJ's summary of Dr. Reece's examinations of Plaintiff reveal that his November 13, 2007 evaluation is *consistent* with Dr. Reece's other evaluations of Plaintiff. The ALJ referenced the following findings from Dr. Reece's other evaluations of Plaintiff: on November 2, 2006, Dr. Reece noted that Plaintiff had a cautious, painful gait and used a cane; on February 2, 2007, she had severely reduced flexion, lateral motion and rotation bilaterally; and while she was taking breakthrough medication daily, her pain control on April 3, 2007, November 26, 2007, and July 9, 2008 was good. (R. 41). Further, the ALJ pointed out that on August 31, 2007, Dr. Reece fully supported Plaintiff's decision to apply for disability benefits. (*Id*.) Additionally, the medication Dr. Reece used to treat Plaintiff with on November 13, 2007 (R. 496) was largely the same medication Dr. Reece prescribed for Plaintiff from July 2006 through July 29, 2008. (R. 501-18, 586-87). In sum, after reviewing the record and the ALJ's summary of Dr. Reece's evaluations, the court concludes that substantial evidence does not support the ALJ's determination that Dr. Reece's November 13, 2007 evaluation of Plaintiff is inconsistent with Dr. Reece's other evaluations of Plaintiff.

As to the "medical evidence of record" that the ALJ viewed as conflicting with Dr. Reece's November 13, 2007 examination of Plaintiff, the ALJ referenced only Dr. Geissele and Dr. Haahs. Further, in dismissing the opinion of Dr. Reece, the ALJ also noted that Dr. Reece "is not a neurosurgeon or specialist in orthopedic surgery. . . . It is significant that claimant's attending neurosurgeon, Dr. Geissele, released [Plaintiff] to return to work in June 2004." (R. 41). Although more weight is generally given to the opinion of a specialist than to the opinion of a source who is not a specialist, 20 C.F.R. § 404.1527(d)(5), Dr. Geissele, the neurosurgeon who performed Plaintiff's disc fusion, last examined Plaintiff in February 2004 (R. 280), less than two weeks after

her disc fusion surgery and more than four years before the hearing, and released Plaintiff to work in June 2004. (R. 438). Dr. Reece's examinations of Plaintiff dated from June 2006 to July 29, 2008. Dr. Geissele's examination of Plaintiff in February 2004 and work release form for Plaintiff in June 2004 (R. 438) are not inconsistent with, nor do they call into question, Dr. Reece's evaluations of Plaintiff which took place over two years later.  Plaintiff's condition could have deteriorated (and, as evidenced by Dr. Reece's evaluations, actually did deteriorate) over time, and the fact that Dr. Reece noted this deterioration, rather than Dr. Geissele, the specialist, does not indicate that Dr. Reece's findings were incorrect. Indeed, Dr. Geissele did not examine Plaintiff during the time period in which she was being treated by Dr. Reece, and the ALJ failed to point to any evidence (much less substantial evidence) demonstrating that Dr. Geissele's evaluations ever contradicted those of Dr. Reece. Therefore, Dr. Geissele's opinion from 2004 are not entitled to controlling weight for the time period during which he was not treating Plaintiff, and the ALJ did not establish good cause for using Dr. Geissele's opinion to discredit Dr. Reece's opinion.

In addition, the ALJ points to the notation by Dr. Haahs, Plaintiff's treating physician from June 2005 through December 2005, that Plaintiff's "pain was out of proportion to MRI findings." (R. 41). What the ALJ failed to note was that in the following sentence, Dr. Haahs recommended Plaintiff be referred to a neurosurgeon or pain clinic. (R. 475). Additionally, the results of the MRI study upon which Dr. Haahs based his statement were as follows: "Left L4 nerve root is difficult to visualize in the L4 foramen due to metallic artifact. There is a suggestion of swelling of this root. If clinically significant, a left L4 radiculopathy might be produced. A radiculitis could have this appearance." (R. 469). Accordingly, Dr. Haahs' statement regarding Plaintiff's MRI findings is not conclusive of Plaintiff's level of pain, and, most importantly, his notation from 2005 does not discredit any of Dr. Reece's evaluations of Plaintiff that occurred well over six months (or more)

20

later. Therefore, this statement by Dr. Haahs, taken out of context and without discussion of the actual MRI findings, does not provide substantial evidence to undercut Dr. Reece's November 13, 2007 examination.

To the extent there is any other medical evidence of record with which Dr. Reece's November 13, 2007 report allegedly conflicts, the ALJ has not pointed to this evidence. The ALJ did not clearly articulate the reasons for disregarding Dr. Reece's November 13, 2007 evaluation and the ALJ's given reasons for doing so are not supported by substantial evidence. *See Phillips*, 357 F.3d at 1240-41. Accordingly, the ALJ's decision does not reflect good cause to disregard the November 13, 2007 evaluation from Dr. Reece. *Id*.

Moreover, it is not entirely clear what medical sources the ALJ considered to reach her decision that Plaintiff had the RFC to perform light work. Indeed, the RFC of "light work" and the physical limitations described by the ALJ match only the *non-examining* assessments of Plaintiff's physical RFC performed by the DDS, two of whom appear to be by non-physicians. (R. 38; 390-97; 412-19; 529-36). The ALJ erred in relying on the opinions of non-examining physicians instead of that of Dr. Reece. *See Lamb*, 847 F.2d at 703.

As to the hypothetical posed to the VE, the court cannot assume that the VE would have answered in a similar manner had the ALJ included Dr. Reece's November 13, 2007 opinion in the hypothetical. *See Pendley v. Heckler*, 767 F. 2d 1561, 1563 (11th Cir. 1985) (concluding that when the ALJ did not comprehensively describe the claimant's severe impairments to the VE, the court was compelled to conclude that the Secretary failed to meet its burden in showing that the claimant could perform other gainful employment in the economy). The incorrect composition of the hypothetical to a VE alone warrants reversal. *Id*. Thus, because the ALJ did not show good cause for disregarding Dr. Reece's November 13, 2007 opinion, and did not present this opinion to the VE,

the court concludes that the hypothetical posed did not incorporate all of Plaintiff's severe impairments.

Therefore, because the ALJ's finding on Plaintiff's RFC and decision to not give controlling weight to Dr. Reece's opinion are not supported by substantial evidence, and these conclusions were crucial to the VE's testimony, this case is ripe for remand pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.[2]

### B.    The ALJ Improperly Dismissed Plaintiff's Subjective Complaints of Pain.

When a claimant attempts to establish disability through her own testimony of pain and other symptoms, the claimant must satisfy two parts of the following three-part "pain standard," which require: (1) evidence of an underlying medical condition, and either (2) objective medical evidence confirming the severity of the alleged pain arising from that condition, or (3) that the objectively determined medical condition is of such a severity that it can reasonably be expected to cause the alleged pain. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *see* 42 U.S.C. § 423(d)(5)(A).[3] If an ALJ discredits a plaintiff's subjective testimony of pain, the ALJ must "explicitly and adequately articulate his reasons." *Wilson v. Barnhart*, 284 F. 3d 1219, 1225, (11th Cir. 2002)

---

[2] The ALJ also disregarded the October 9, 2008 IR myelography and CT scan of Plaintiff's lumbar spine, which were requested by Dr. Maxy, a neurosurgeon. (R. 581-82). Dr. Reece had referred Plaintiff to Dr. Maxy. Dr. Maxy's notes dated October 3 and 14, 2008, interpreting Plaintiff's tests, were not before the ALJ but had been provided to the Appeals Council. (R. 590-91). Dr. Maxy stated that Plaintiff had a "far right disk protrusion at L3-4 causing some right-sided neural impingement" and may require more surgery.  (R. 590). Because a sentence four remand is also warranted when the Appeals Council has failed to adequately consider newly submitted evidence, *Ingram v. Commissioner of Social Sec. Admin.*, 496 F. 3d 1253, 1268 (11th Cir. 2007), and the Appeals Council here failed to adequately review Dr. Maxy's interpretation of Plaintiff's tests, this case is due to be remanded on this basis as well. The court expresses no opinion on how this evidence affects the ALJ's decision, but because the report from Dr. Maxy, a specialist, reveals a worsening in Plaintiff's condition, it may be appropriate for the Commissioner on remand to consider Dr. Maxy's review of the CT scan.

[3] Although Plaintiff's hearing before the ALJ was held in the Fourth Circuit, the Eleventh Circuit standard mirrors 42 U.S.C. § 423(d)(5)(A), which controls in both circuits. Thus, if the ALJ had applied the appropriate legal standards in evaluating Plaintiff's subjective testimony of pain, the ALJ would have necessarily followed the Eleventh Circuit standard regardless of circuit or location.

(citations omitted). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Id*. (citations omitted).

The ALJ determined that Plaintiff's subjective testimony about her pain was not credible because Plaintiff's statements regarding the "intensity, persistence and limiting effects" of her symptoms are inconsistent with her RFC assessment. (R. 39). However, as the ALJ's RFC assessment is not based on substantial evidence, as previously discussed, the ALJ's statement is insufficient to justify her finding regarding the credibility of Plaintiff's subjective complaints. To be sure, the ALJ discussed certain evidence in the record on which she based her credibility determination. First, the ALJ stated that the claimant "does not have muscle or disuse atrophy, which one would suspect if she did nothing more than lie around the house as claimed." (R. 39). Then, the ALJ proceeded to discuss Plaintiff's history of narcotic use, accidental overdose of the Fentanyl patch, her work as a home health care worker, and that she was noted to be a poor historian by Lane. In determining whether the ALJ properly assessed Plaintiff's credibility, this court must view "the entire record and take account of the evidence in the record which detracts from the evidence relied on by the [Secretary]." *Foote*, 67 F.3d at 1562 (citations omitted).

The ALJ implied that Plaintiff's drug usage injured her credibility. Plaintiff had been taking strong pain medications prior to and immediately after the disk fusion surgery to relieve her pain, and the surgery itself was aimed at reducing Plaintiff's pain. Dr. Geissele's statement about the need to downgrade Plaintiff's medication was made soon after Plaintiff's surgery, at a time where the reason for Plaintiff's heavy use of pain medication was justified and expected. Considering the record evidence as a whole, the ALJ took Dr. Geissele's statement out of context, and ignored the fact that when he made that statement, Dr. Geissele prescribed Plaintiff with Percocet and noted that he planned to gradually reduce Plaintiff's dosage of medications. (R. 280). Thus, the ALJ's

23

interpretation of Dr. Geissele's statement is based on a selective reading of the record, and to the extent this statement was used to discredit Plaintiff's testimony, the court concludes that the ALJ's credibility determination is not based on substantial evidence. Additionally, the court cannot conclude that the ALJ's reference to the fact that Plaintiff discontinued treatment with Dr. Gold after she reported her medications were stolen is accurate for a simple reason: the circumstances surrounding the end of Dr. Gold's treatment of Plaintiff are not described in the record.

As to the ALJ's reference to Plaintiff's accidental overdose on Fentanyl patches, it seems that the ALJ discredited Plaintiff's testimony because the ALJ believed that this overdose involved a deliberate misuse of the Fentanyl patch. (*See* R. 39, 328). However, the ALJ cannot discredit Plaintiff's credibility based on a belief that the finding that Plaintiff's overdose was *accidental* was wrong. Such a "belief" is not supported by the record.  Additionally, the ALJ appeared to ignore the fact that Plaintiff's physicians continued to prescribe her the Fentanyl patch, as well as other strong narcotic medications, after the overdose, because these medications were necessary to control her pain. It hardly seems reasonable to understand that Plaintiff's physicians "believed" she was misusing prescription medication, yet continued to prescribe the mediation to her.  Any suggestion otherwise by the ALJ has not been explicitly or adequately explained and, in any event, is not supported by substantial evidence on this record.

Moreover, the ALJ noted that if Plaintiff's testimony that she did nothing more than lie around the house were true, she would have muscle or disuse atrophy, which she does not have. (R. 39). One of Plaintiff's physicians, Dr. Chen, noted the lack of muscle atrophy in Plaintiff's records, but did not draw any conclusions about Plaintiff's activities of daily living from this observation. (R. 363). The ALJ's statement on the correlation between muscle atrophy and lack of activity is the product of the ALJ's interpretation of medical data. This is just the sort of medical determination

that is reserved for physicians, not an ALJ.  *See Haag v. Barnhart*, 333 F. Supp. 2d 1210, 1229 (N.D. Ala. 2004) (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring) (a hearing officer may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional)). Thus, the statement on muscle or disuse atrophy by the ALJ is not supported by substantial evidence.

As to the ALJ's references to Plaintiff's work as a home health care worker,  the ALJ seems to have discredited Plaintiff's testimony that her parents performed most of her work for her without explaining the reasons for discrediting this testimony, and ignored the fact that this work was classified as an "Unsuccessful Work Attempt" by the SSA. (R. 214). Additionally, with respect to the ALJ's reference to the fact that she was noted to be a poor historian, the ALJ again took this statement out of context. Although Lane noted that Plaintiff was "somewhat of a poor historian," the ALJ ignored the latter part of this observation, which was that her memory problems were "due to demonstrated problems with cognition that were moderate in nature." (*See* R. 367).  To the extent the ALJ has relied on the above factors in discrediting Plaintiff's testimony, the ALJ has not explicitly nor adequately explained her reasons, and the ALJ's selective review of the record demonstrates that her findings were not supported by substantial evidence.

In sum, when stating that she found Plaintiff's testimony regarding her pain not credible, the ALJ did not consider the entire medical record. It was error for the ALJ to exclude certain evidence from consideration of the severity of Plaintiff's condition when objective medical evidence supported the existence of an underlying medical condition capable of giving rise to pain. Even if the ALJ did consider this evidence in making her findings, the ALJ did not make that clear, and the ALJ has not explicitly or adequately set forth reasons for discrediting Plaintiff's testimony.

Therefore, substantial evidence does not support the ALJ's decision to discredit Plaintiff's subjective complaints of pain.

**VII.    Conclusion**

The court concludes that (1) the ALJ's determination of Plaintiff's RFC was not based on substantial evidence, as the ALJ failed to show good cause for discrediting Dr. Reece's opinion; (2) because of this finding, the hypothetical posed to the VE did not incorporate all of the relevant evidence of Plaintiff's limitations; and (3) the ALJ's determination discrediting Plaintiff's subjective complaints of pain was not supported by substantial evidence.  The Commissioner's final decision is, therefore, due to be reversed and remanded. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this _____6th_____ day of July, 2012.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE